IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY MARYLAND

CANDACE E. ALSTON                     )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )      CIVIL ACTION NO. CAL13-09587
                                      )      **JURY TRIAL DEMANDED**
WELLS FARGO HOME MORTGAGE             )
                                      )
        Defendant.                    )

## COMPLAINT

COMES NOW the Plaintiff, Candace E. Alston, (hereafter the "Plaintiff") and for her complaint against the Defendant Wells Fargo Bank, N.A. ("Wells Fargo") alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* (hereinafter "FCRA"), the Real Estate Settlement Procedures Act, 12 U.S.C. §2605 *et seq.* (hereinafter "RESPA") and the Maryland Consumer Protection Act, Md. Code Ann., Com Law §13-101 *et seq* (hereinafter "MCPA") and the common law tort of defamation.

### PARTIES

2.      The plaintiff is a natural person and resides in Prince George's County, Maryland. She is a "consumer" as defined by the FCRA, 15 U.S.C. §1681a(c) and a "person" as that term is defined by the MCPA at §13-101(c)(1).

3.      Defendant Wells Fargo is a national banking association organized under the laws of the United States. America's Servicing Company ("ASC") is a division of Wells Fargo Home Mortgage ("WFHM") that services loans for other investors under the ASC name. WFHM is a division of Wells Fargo Bank, N.A and primarily services loans for Wells

Fargo. On May 8, 2004 WFHM merged into Wells Fargo Bank, N.A.  Wells Fargo is a mortgage originator and mortgage "loan servicer," as defined at 12 U.S.C. §2605(i)(2) and a furnisher of information as contemplated by FCRA section 1681s-2(a) & (b), that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer.

## FACTS

4.     On November 12, 2010 Ms. Alston obtained a mortgage loan from Monarch Bank ("Monarch") to purchase 7929 Mandan Rd, Greenbelt, Maryland ("Property"). In exchange for the mortgage loan Ms. Alston executed a promissory note ("Note") to the benefit of Monarch.

5.     Nearly two (2) months later Ms. Alston received a Notice of Transfer of Ownership from Wells Fargo stating that Wells Fargo purchased the loan on December 16, 2010. The notice also stated that the servicing of the loan would be transferred to Wells Fargo on February 1, 2011. Wells Fargo further stated that Monarch Bank may have recorded the purchase transaction in the land records of Prince George's County.

6.     Ms. Alston received a February mortgage statement from both Monarch Bank and Wells Fargo.

7.     Ms. Alston checked the land records in Prince George's County but found no record of an assignment transferring the loan from Monarch to Wells Fargo. On January 20, 2011 Ms. Alston sent a letter to Wells Fargo asking for proof that Wells Fargo owned the loan and had rights to service the loan. Ms. Alston specifically asked for a copy of the assignment, proof of consideration, and a properly endorsed certified copy of the Note. Ms.

2

Alston also stated that Wells Fargo should verify their status before attempting to collect payment from her.

8.     Wells Fargo responded to Ms. Alston with a letter dated February 3, 2011 that stated Wells Fargo was the servicer, MERS holds the title to the loan, and that "[t]here will be no other assignment." Enclosed with Wells Fargo letter was a copy of the Note. The Note was endorsed to Bank of America. The endorsement read "Pay to the order of Bank of America" and was signed by Monarch Bank's senior vice president Timothy F. Miller.

9.     On March 3, 2011 Ms. Alston responded with a letter advising Wells Fargo that the Note was not endorsed to Wells Fargo, repeating her request for a copy of the assignment and reiterating that Wells Fargo not to attempt to collect payment prior to establishing its right to collect.

10.     Ms. Alston received a March mortgage statement from Monarch Bank but did not receive such from Wells Fargo.

11.     On March 22, 2011 Wells Fargo executed a letter repeating its claim that it is the servicer and that MERS holds title to the mortgage. Wells Fargo was silent on who owns the Note.

12.     Ms. Alston responded with a letter on April 1, 2011 requesting Wells Fargo identify for whom it services the loan. Ms. Alston did not receive a mortgage statement from Wells Fargo during the month of March but did receive a mortgage statement from Monarch Bank.

13.     Upon information and belief Wells Fargo began reporting the mortgage account as delinquent to each of the three major credit reporting agencies ("CRA's" or "credit bureaus") in April of 2011.

3

14.     Ms. Alston received an April mortgage statement from Monarch Bank but did not receive such from Wells Fargo.

15.     On April 13, 2011 Wells Fargo executed a Notice of Intent to Foreclose, which stated that a default had occurred on February 2, 2011 and that the amount to cure the default was $2,434.59.

16.     Ms. Alston responded on April 21, 2011 with a letter addressed to Wells Fargo's president to whom she pleaded her case that the foreclosure should be stopped. Ms. Alston stated in her letter that the Note was not endorsed to Wells Fargo, that both Monarch Bank and Wells Fargo were trying to collect on the account, that she was tendering payments to Monarch Bank, and that she is prepared to pay Wells Fargo once it legally proves its right to enforce the Note.

17.     On or about April 18, 2011 Wells Fargo executed a letter responding to Alston's April 1st letter. In Wells Fargo response it identified GNMA as the investor for the loan. The letter also repeated Wells Fargo claim that it is the servicer and further stated that all inquiries and concerns should be addressed to Wells Fargo. The letter also suggested Ms. Alston contact its Collections Department.

18.     In response Ms. Alston called Wells Fargo on or about April 28, 2011 and spoke with Veronica Garcia in loss mitigation. Ms. Garcia said she could not verify Wells Fargo owned or serviced Alston's account and unsuccessfully attempted to connect Ms. Alston to her two points of contacts Brendan Curley and Deanna Stafford.

19.     Ms. Alston received a May mortgage statement from both Monarch Bank and Wells Fargo.

4

20.  In correspondence dated May 23, 2011 Ms. Alston complained to Mr. Curley that she tried contacting him on several occasions but he has yet to return her calls. She also requested the date GNMA became the investor, the telephone number for GNMA, and the location of the place where the transfer to GNMA was recorded.

21.  On June 23, 2011 Ms. Alston executed a letter addressed to both Curley and Stafford expressing her frustration in her futile attempts to get answers and documentation from Wells Fargo. Ms. Alston concluded her letter by stating that "as soon as Wells Fargo provides [her] the documentation that shows they are the rightful party to receive payment [she] will make payment."

22.  On July 5, 2011 Curley responded for Wells Fargo with a letter enclosed with a copy of the Note. The endorsement on the Note had been altered in that the name of the endorsee/payee, Bank of America, had a line crossing through it and the name Wells Fargo was inserted just above it. The alteration of the endorsement was initialed "S C".

23.  Upon information and belief the original endorser, Timothy F. Miller, initials is not "S C."

24.  Ms. Alston received a June and July mortgage statement from Monarch Bank but did not receive as such from Wells Fargo.

25.  In June and July of 2011 Ms. Alston ordered her credit reports for TransUnion, Equifax and Experian. Each of the three credit reporting agencies were reporting the Wells Fargo account as delinquent 120 plus days with a balance of at least $3,200.

26.  On or shortly after July 12, 2011 Ms. Alston disputed the Wells Fargo account with all three credit-reporting agencies.

27.     On or about July 17, 2011 a representative from Wells Fargo named Jennifer [ID#D46] called Ms. Alston to make arrangements for Ms. Alston to pay her mortgage default. Ms. Alston explained that the ownership of the loan was in doubt. Jennifer initially stated that Wells Fargo was the owner of the loan, but after viewing the April 18th letter from Brendan Curley stating that GNMA was the owner, she agreed that the ownership of the loan needs to be investigated.

28.     On or about July 18, 2011 Ms. Alston sent a letter to Wells Fargo stating that Wells Fargo should not be reporting her as delinquent while the account was under dispute and stipulated that it stop reporting this account to the credit bureaus until Wells Fargo verified it had authority to enforce the Note.

29.     On August 3, 2011 Wells Fargo responded with a letter stating that its records reflected that Wells Fargo is the investor and servicer. Wells Fargo also stated that the loan was due for February and that Wells Fargo is required to report the account.

30.     Between August 1st and August 12th all the CRAs completed their investigations and each confirmed the Wells Fargo account was being reported accurately. Upon information and belief Wells Fargo instructed the CRAs to continue reporting the account as delinquent.

31.     On August 23, 2011 Ms. Alston called the designated contact person in Wells Fargo August 3rd letter. Ms. Alston explained that she was making payments to Monarch Bank and that she does not have sufficient proof that Wells Fargo can enforce the Note. At the close of the conversation the Wells Fargo representative agreed to call Ms. Alston back after investigating her concerns.

32.    On August 17, 2011 Ms. Alston was involved in an auto accident with a drunk driver that totaled her car. Shortly thereafter, she applied for a car loan with her bank Capital One but was denied. Capital One stated that the auto loan was denied due to a "delinquent mortgage account."

33.    On or about September 9, 2011 Ms. Alston learned that an Assignment of Deed of Trust had been recorded in the land records of Prince George's County. The Assignment purported to assign the Deed of Trust from Monarch Bank to Wells Fargo. The Assignment was executed on August 25, 2011 and recorded on September 1, 2011.

34.    On September 11, 2011 Ms. Alston wrote a letter to the representative who promised to investigate her concerns during the August 23rd conversation. In her letter she reminded him of her concerns and his promise to call her back after his investigation. She also mentioned that she recently was denied credit from another institution on the basis of Wells Fargo reporting of this account. She further stated that she is paying Monarch Bank because Wells Fargo has not substantiated its authority to enforce the Note. She also pointed out that Wells Fargo doesn't even send monthly mortgage statements. She concluded by stating that Wells Fargo was prohibited from reporting the account while the account was under dispute.

35.    On September 27, 2011 Wells Fargo executed a letter in response to Ms. Alston's September 11th letter. Wells Fargo reiterated its position that its records indicate Wells Fargo is both the investor and servicer. Wells Fargo further announced that it was required to report the accurate payment history of her loan and "unable to honor [her] request to amend the reporting for [her] loan."

7

36.     On October 10, 2011 Ms. Alston responded with a letter enclosed with a Monarch Bank mortgage statement for the month of August and a copy of the check payable to Monarch Bank. asked that Wells Fargo stop reporting her account as delinquent based on the documents enclosed with her letter. Ms. Alston explained that she has received conflicting information from Wells Fargo and Monarch Bank regarding the servicer and owner of the loan. She stated that she was willing to stop paying Monarch Bank and pay Wells Fargo once Wells Fargo verified it had authority to enforce the Note. Ms. Alston further explained that she is trying to apply for a car loan but that she could not qualify because of the manner in which Wells Fargo was reporting the account. She explained that by simply reporting the account delinquent 180 days with a balance of $7,303 the false impression is created implying that she is not making payments to anyone. She concluded the letter with a statement that Wells Fargo was prohibited from reporting the account while it was under dispute.

37.     On October 28, 2011 Wells Fargo executed a letter stating that the servicing of Ms. Alston's loan was being transferred to Monarch Bank effective November 15, 2011.

38.     On November 1, 2011 Ms. Alston applied for another car loan with Capital One Bank but was once again denied for "delinquent mortgage account." Ms. Alston then applied with another institution – Bank of America – but was also denied.

39.     On or about November 22, 2011 Wells Fargo executed a letter stating that it submitted a request to each of the four major credit bureaus to show the account as a service transfer with a zero balance owing to Wells Fargo.

40.     On or about November 30, 2011 Ms. Alston applied for another car loan with both Capital One and SunTrust but both applications were denied.

41.     Thereafter, Ms. Alston began seeing a psychologist to cope with the emotional and mental distressing arising from Wells Fargo foregoing actions and/or inactions.

42.     In the new year of 2012 Ms. Alston sought to take advantage of the low interest rates and refinance her mortgage. She applied for a refinance loan with Virginia Heritage Bank. Settlement was scheduled for February 29, 2012 and the loan would have lowered her interest rate three-fourths of a percent, which would have reduced her monthly payment by $50. Virginia Heritage Bank latter denied the loan after finding out about the Wells Fargo account.

43.     Ms. Alston also tried to refinance her mortgage with 1ST Step Financial Services but was denied due to the reporting of the Wells Fargo account.

### COUNT ONE: VIOLATIONS OF MCPA

44.     Plaintiff realleges and incorporates paragraphs 1 through 43 above as if fully set out herein.

45.     Plaintiff received a mortgage loan, which is a "consumer transaction" within the meaning of the Maryland Consumer Debt Collection Act (or "MCDCA"), Md. Code Ann., Com Law §14-201(c). Wells Fargo and/or its agent Bierman, Geesing & Ward ("BGW") attempted to the collect on the debt arising out of that mortgage loan and are "collectors" within the meaning of MCDCA, §14-201(b).

#### *The June 9, 2011 Letter*

46.     In correspondence dated June 9, 2011 Wells Fargo advised Ms. Alston that her loan was in default and that her loan file had been referred to its attorneys with instructions to begin foreclosure proceedings. The letter further noted its attorneys as BGW. The letter was signed Foreclosure Department.

47.     Wells Fargo statements were deceptive and misleading in that they inferred Wells Fargo was entitled to enforce the Note. The use of the term "the [] loan file has been referred to our attorney with instructions to begin foreclosure proceedings" falsely implied that Wells Fargo had a legal right to foreclose and intended on foreclosing, a violation of Md. Code Ann., Comm. Law, §§ 13-301(1) and 13-303(5), which prohibits the use of false or misleading written statements that have the capacity of misleading consumers in any attempt to collect a consumer debt.

48.     Upon information and belief, Wells Fargo had no intention of foreclosing but was only threatening Ms. Alston in a deceptive ploy to extort payments from her, a violation of Md. Code Ann., Comm. Law, §§ 13-301(14)(iii) and 14-202(8), which prohibits claiming or threatening to enforce a right with knowledge that the right does not exist in any attempt to collect an alleged debt.

### *The July 1, 2011 Letter*

49.     In correspondence July 1, 2011 BGW advised Ms. Alston that the holder of the note referred her loan for legal action based upon a default. The letter further announced that Ms. Alston should contact Wells Fargo to payoff the loan. The letter concluded by stating a foreclosure sale may be scheduled within thirty days.

50.     BGW statements were deceptive and misleading in that they inferred Wells Fargo was entitled to enforce the Note and that BGW had legal authority to conduct a foreclosure action. The use of the terms "[t]he loan has been referred to this office by the holder of the note for legal action based upon a default" and "a foreclosure sale ... may be scheduled ... prior to the expiration of [] thirty day[s]" falsely implied that either or both Wells Fargo and/or BGW had a legal right to foreclose and intended on foreclosing, a

10

violation of Md. Code Ann., Comm. Law, §§ 13-301(1) and 13-303(5), which prohibits the use of false or misleading written statements that have the capacity of misleading consumers in any attempt to collect a consumer debt.

51.     Neither BGW nor any of its attorneys were appointed Trustee or granted any such authority that would permit BGW to initiate a foreclosure action on behalf of Wells Fargo.

52.     Upon information and belief, Wells Fargo had no intention of appointing BGW as a substitute trustee to actual initiate a foreclosure action but was only threatening Ms. Alston in a deceptive ploy to extort payments from her, a violation of Md. Code Ann., Comm. Law, §§ 13-301(14)(iii) and 14-202(8), which prohibits claiming or threatening to enforce a right with knowledge that the right does not exist in any attempt to collect an alleged debt. .

*The October 10, 2011 Letter*

53.     On or about July 14, 2011 Ms. Alston sent BGW a request for verification of the debt. Ms. Alston specifically asked for a current copy of the Note and a MERS Milestone report and/or other documentation clearly delineating that Wells Fargo is the current owner.

54.     Nearly 3 months later BGW responded with correspondence dated October 10, 2011, which included a letter enclosed with a copy of the original note, the deed of trust, and a payment history. The payment history indicated that the loan was in an active foreclosure status.

55.     BGW statements were deceptive and misleading in that they inferred a foreclosure had been initiated. The use of the terms "LOAN IS IN FORECLOSURE" and "ACTIVE FORECLOSURE" in and of itself falsely imply a foreclosure action had been

11

initiated. And certainly when taken in context of the previous correspondences dated July 1, 2011 and June 9, 2011, it falsely implied that either or both Wells Fargo and/or BGW had begun foreclosure proceedings, a violation of Md. Code Ann., Comm. Law, §§ 13-301(1) and 13-303(5), which prohibits the use of false or misleading written statements that have the capacity of misleading consumers in any attempt to collect a consumer debt.

56.     No foreclosure action was ever filed and upon information and belief, Wells Fargo had no intention of ever foreclosing but was only threatening and harassing Ms. Alston in a deceptive ploy to extort payments from her, a violation of Md. Code Ann., Comm. Law, §§ 13-301(14)(iii) and 14-202(8), which prohibits claiming or threatening to enforce a right with knowledge that the right does not exist in any attempt to collect an alleged debt.

*Summary*

57.     The above-described collection communications made to Ms. Alston by Defendant Wells Fargo or its agent BGW were made in direct violation of numerous provisions of the MCPA.

58.     This collection communications caused Ms. Alston emotional distress and anxiety.

59.     Ms. Alston suffered actual damages as a result of these illegal collection communications by Defendant Wells Fargo and its agent BGW in the form of anxiety, emotional distress and fear of losing her property, amongst other negative emotions. In addition, Ms. Alston began to suffer from insomnia, migraines and depression. Ms. Alston was so distraught by Defendant's action that she started to engage in emotional eating and incurred substantial weight gain.

*Respondeat Superior Liability*

60.     The acts and omissions of BGW, as attorneys and debt collectors employed by Defendant Wells Fargo, were committed within the time and space limits of their agency relationship with their principal, Defendant Wells Fargo.

61.     The acts and omissions by BGW were incidental to, or of the same general nature as, the responsibilities they were authorized to perform by their principal, Defendant Wells Fargo, in collecting consumer debts.

62.     By committing these acts and omissions against Ms. Alston, BGW was motivated to benefit their principal, Defendant Wells Fargo.

63.     Defendant Wells Fargo is therefore liable to Ms. Alston through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of the Maryland Consumer Protection Act by BGW and its collection employees in their attempts to collect this alleged debt from Ms. Alston.

64.     Defendant Wells Fargo and/or its agent BGW violated MCDCA, §14-202(8) by claiming a right to foreclose and threatening to foreclose with knowledge that they had no right to foreclose. Defendant's liability of MCDCA, §14-202(8) also constitutes liability under MCPA, §13-301(14)(iii).

65.     All the foregoing acts of the Defendant Wells Fargo, BGW and their agents constitute an unfair and deceptive act as made applicable by MCPA, §§ 13-301(1), 13-301(14)(iii) and 13-303(5).

66.     As a result of each and every Defendant's violation of the MCPA, Plaintiff is entitled to actual damages and attorney's fees pursuant to MCPA, §13-408 from Defendant herein.

## COUNT TWO: VIOLATIONS OF RESPA

67.     Plaintiff realleges and incorporates paragraphs 1 through 66 above as if fully set out herein.

68.     Plaintiff submitted letters that constitute "qualified written requests" under 12 U.S.C. §2605(e)(1)(B). Plaintiff's letters were written correspondence other than notice on a payment coupon or other payment medium supplied by Defendant Wells Fargo and contained Plaintiff's name, account number, and statements of reasons for belief of Plaintiff that the account was in error or requests for information. Plaintiff's letters were related to "servicing" as that term is defined under 12 U.S.C. §2605(i)(3), in that each letter pertained to Defendant Wells Fargo's servicing of the Note:

69.     Defendant Wells Fargo violated 12 U.S.C. §2605(e) on multiple occasions by failing to make appropriate corrections to Plaintiff's account after receiving Plaintiff's "qualified written requests."

70.     Defendant Wells Fargo violated 12 U.S.C. §2605e(2)(C) on multiple occasions by failing to conduct a reasonable investigation that provided the information requested by Plaintiff or an explanation of why the information requested is unavailable or cannot be obtained by Defendant.

71.     Defendant Wells Fargo violated 12 U.S.C. §2605e(3) on several occasions by providing information to Experian, Equifax and Trans Union regarding purportedly delinquent and/or overdue payments owed by Plaintiff during the sixty (60) days that followed Wells Fargo's receipt of Plaintiff's qualified written requests.

72.     Defendant Wells Fargo's violations were numerous and consistent, constituting a "pattern or practice" of noncompliance with the requirements of 12 U.S.C §2605 *et seq.*

73.     As a result of the conduct, actions and inactions of Wells Fargo, Plaintiff suffered actual damages including without limitation, by example only and as described herein by Plaintiff: out-of-pocket expenses, frustration, upset, loss of credit, embarrassment, humiliation, severe emotional distress and severe mental distress.

74.     Defendant's conduct was the proximate cause of Plaintiff's injuries, rendering Defendant liable for actual damages in an amount to be determined by the jury pursuant to 12 U.S.C. §2605f(1)(A), statutory damages pursuant to 12 U.S.C. §2605f(1)(B), costs and reasonable attorney's fees pursuant to 12 U.S.C. §2605f(3).

## COUNT THREE: VIOLATIONS OF FCRA

75.     Plaintiff realleges and incorporates paragraphs 1 through 74 above as if fully set out herein.

### *Ms. Alston Disputes Via Equifax*

76.     Ms. Alston obtained her Equifax credit report on June 30, 2011. The Defendant was reporting the mortgage account as:

    a.      120+ days past due;

    b.      having a past due balance of $4,057;

    c.      having a balance of $102,077;

    d.      the date of last payment as 01/2011; and

    e.      the date of first delinquency as 03/2011.

77.     Ms. Alston submitted an online dispute of the Wells Fargo account to Equifax on July 12, 2011. Upon information and belief Equifax forwarded the dispute to Wells Fargo.

78.     Wells Fargo instructed Equifax to continue reporting the account in practically the same negative manner after receiving Plaintiff's dispute. The only differences were that Wells Fargo instructed Equifax to report the account as:

        a.      a collection account;

        b.      150-179 days past due as of May 2011; and

        c.      date of first delinquency as 02/2011.

79.     Ms. Alston submitted another dispute to Equifax on or about Nov 21, 2011. In this dispute Ms. Alston provided information and attached documents showing that Monarch Bank was the payee of the note and still requesting payments. Ms. Alston also enclosed a copy of a payment from her to Monarch Bank. Upon information and belief Equifax forwarded the dispute to Wells Fargo.

80.     Wells Fargo instructed Equifax to continue reporting the account in a similarly negative fashion after receiving Plaintiff's second dispute.  The only differences were that Wells Fargo was now instructing Equifax to report the account:

        a.      as over 120 days past due;

        b.      transferred or sold; and

        c.      closed on 11/2011.

81.     On February 28, 2012 Ms. Alston submitted yet another dispute to Equifax. This time Ms. Alston included substantially more detailed information in the dispute and enclosed several documents, which included several Monarch Mortgage Statements, a copy of the Note, an Amortization Schedule, the Equifax credit report from February 24, 2012 and

an Equifax Credit Report from August 11, 2011. Upon information and belief Equifax forwarded the dispute to Wells Fargo.

82.     In response to Ms. Alston's third dispute, Wells Fargo again instructed Equifax to continue reporting the account in the same negative manner but as 180 or more days past due as of 10/2011 and *as paid in August 2011*.

83.     Ms. Alston submitted two other disputes to Equifax in April and May of 2012 to which Wells Fargo responded by instructing Equifax to continuing reporting the account in a nearly identical manner.

### *Ms. Alston Disputes Via Transunion*

84.     Ms. Alston obtained her Transunion credit report on July 12, 2011. The Defendant was reporting the mortgage account as 120+ days past due with a past due balance of $4,057 and the date of last payment being 01/2011.

85.     Ms. Alston submitted an online dispute to Transunion on July 17, 2011. Upon information and belief Transunion forwarded the dispute to Wells Fargo.

86.     Wells Fargo instructed Transunion to continue reporting the account in practically the same negative manner after receiving Plaintiff's dispute.

87.     Ms. Alston submitted another dispute to Transunion on or about September 22, 2011. Upon information and belief Transunion forwarded the dispute to Wells Fargo.

88.     Wells Fargo instructed Transunion to continue reporting the account in practically the same negative manner after receiving Plaintiff's second dispute.  The only difference was the Wells Fargo was now instructing Transunion to report the account as $7,303 and *as paid in August 2011*.

89.     Ms. Alston submitted another dispute to Transunion on or about Nov 21, 2011. In this dispute Ms. Alston provided detailed information and attached documents showing that Monarch Bank was the payee of the note and still requesting payments. Ms. Alston also enclosed a copy of a payment from her to Monarch Bank. Upon information and belief Transunion forwarded the dispute to Wells Fargo.

90.     Wells Fargo instructed Transunion to continue reporting the account in a similarly negative fashion after receiving Plaintiff's dispute. The only difference was the Wells Fargo was now instructing Transunion to report the account closed as of 11/15/2011 with a $0 balance.

91.     On June 12, 2012 Ms. Alston submitted yet another dispute to Transunion. This time Ms. Alston included detailed information with many more documents--which included several Monarch Mortgage Statements, a copy of the Note, Mortgage Interest Statement from Monarch, an Amortization Schedule, an Equifax credit report from February 24, 2012 and Equifax credit report from June 30, 2011. Upon information and belief Transunion forwarded the dispute to Wells Fargo.

92.     In response to Ms. Alston's third dispute Wells Fargo again instructed Transunion to continue reporting the account in the exact same negative manner.

### Ms. Alston Disputes Via Experian

93.     Ms. Alston obtained her Experian credit report on July 11, 2011. The Defendant was reporting the mortgage account as 120 days past due with a past due balance of $4,057.

94.     Shortly thereafter Ms. Alston submitted an online dispute to Experian. Upon information and belief Experian forwarded the dispute to Wells Fargo.

95.    Wells Fargo instructed Experian to continue reporting the account in practically the same negative manner after receiving Plaintiff's dispute. The only difference was the Wells Fargo was now instructing Experian to report the account 150 days past due.

96.    On June 12, 2012 Ms. Alston submitted another dispute to Experian. This time Ms. Alston included detailed information in the dispute and enclosed several documents, which included several Monarch Mortgage Statements, a copy of the Note, a Mortgage Interest Statement, an Amortization Schedule, an Equifax credit report from February 24, 2012 and Equifax credit report from June 30, 2011. Upon information and belief Experian forwarded the dispute to Wells Fargo.

97.    In response to Ms. Alston's dispute Wells Fargo again instructed Experian to continue reporting the account in a similarly negative fashion.

*Wells Fargo Liability*

98.    This credit reporting by Wells Fargo to the CRAs was false because Wells Fargo was not entitled to receive payment and Plaintiff had made timely payments on her mortgage to Monarch Bank.

99.    Additionally, Wells Fargo was made aware of the fact that the Note was not endorsed to it and that Plaintiff was paying Monarch Bank until Wells Fargo obtained proper documentation to enforce the Note. Wells Fargo even acknowledged on at least two occasions that the ownership of the loan needed to be investigated.

100.    Plaintiff paid her mortgage payments in accordance with the law. Under the law Wells Fargo was not entitled to receive payment because it did not qualify as holder of the Note. Wells Fargo did not qualify as a holder of the Note because the Note was endorsed to Bank of America. Any subsequent alterations and/or endorsements were not made or

19

authorized by the holder. Wells Fargo knows Bank of America did not endorse the Note to Wells Fargo and that the endorsement was not cancelled. Wells Fargo knows it was not entitled to enforce the Note.

101.    Wells Fargo had actual knowledge that its reporting was inaccurate and deliberately chose to ignore and permit reporting of the inaccurate account.

102.    Upon information and belief, the CRAs each prepared and published to third parties multiple inaccurate reports about Plaintiff which contained inaccurate derogatory information regarding the subject account.

103.    Upon information and belief, the CRAs each forwarded Plaintiff's disputes to Wells Fargo on one or more occasions. Upon information and belief, Wells Fargo was provided notice of Plaintiff's disputes and despite such notice, it failed and refused to investigate and correct its inaccurate reports.

104.    Wells Fargo violated 15 U.S.C. § 1681s-2(b)(1)(A) on several occasions within the past two years, by example only and without limitation, by failing to fully and properly investigate Plaintiff's disputes.

105.    Wells Fargo violated 15 U.S.C. § 1681s-2(b)(1)(B) on several occasions within the past two years, by example only and without limitation, by failing to review all relevant information provided by the consumer reporting agencies.

106.    Wells Fargo violated 15 U.S.C. § 1681s-2(b)(1)(C)-(E) on one or more occasions within the past two years, by example only and without limitation, by failing to notate the account was disputed; failing to modify, delete, or block the reporting of the account; and failing to correctly report results of an accurate investigation to each credit reporting agency.

107.   As a result Wells Fargo's foregoing violations of 15 U.S.C. § 1681s-2(b), Plaintiff's suffered actual damages, including but not limited to: out-of-pocket costs, loss of credit, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

108.   The violations of Wells Fargo were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, Wells Fargo was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

109.   The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Wells Fargo in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT FOUR: DEFAMATION

110.   Plaintiff realleges and incorporates paragraphs 1 through 109 above as if fully set out herein.

111.   Wells Fargo intentionally and maliciously instructed the CRAs to report publicly that Plaintiff had a delinquent mortgage account.

112.   Wells Fargo's statements to the CRAs that Plaintiff had a delinquent mortgage account were false.

113.   Wells Fargo published the statements without a privilege.

114.   As a result of Defendant's publication, Plaintiff's credit scored was reduced, credit applications were denied, and credit opportunities were lost. Plaintiff has also suffered substantial, actual damages including but not limited to: out-pocket expenses, frustration, upset, humiliation and embarrassment, emotional and mental pain and suffering.

115.    Defendant's conduct was the proximate cause of Plaintiff's injuries, rendering Defendant liable for compensatory damages.

WHEREFORE, your Plaintiff demands judgment for actual, statutory and punitive damages against Wells Fargo; for her attorney's fees and costs; for prejudgment and post-judgment interest at the legal rate, and such other relief as the Court deems just, equitable and proper.

**TRIAL BY JURY IS DEMANDED.**

CANDACE E. ALSTON

By _____

Candace E. Alston
10012 Cedarhollow Lane
Largo, Maryland 20774
(301) 350-5780
*Pro Se Plaintiff*

22