**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

CANDACE E. ALSTON,

    Plaintiff,

    v.

WELLS FARGO HOME MORTGAGE,

    Defendant.

Civil Action No. TDC-13-3147

**MEMORANDUM OPINION**

Plaintiff Candace E. Alston has filed suit against Defendant Wells Fargo Home Mortgage ("Wells Fargo") for claims relating to a mortgage she obtained for a property in Greenbelt, Maryland. Pending before the Court are Alston's Motion for Reconsideration, Wells Fargo's Motion for Summary Judgment, and Wells Fargo's Motion to Amend Answer. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local Rule 105.6. For the reasons set forth below, Alston's Motion for Reconsideration is DENIED, Wells Fargo's Motion for Summary Judgment is GRANTED, and Wells Fargo's Motion to Amend Answer is DISMISSED AS MOOT.

**BACKGROUND**

**I.     The Mortgage**

On November 12, 2010, Alston obtained a mortgage loan from Monarch Bank ("Monarch") in the amount of $102,212.00 for a property located at 7929 Mandan Road, Apartment 301, in Greenbelt, Maryland ("the Property"). On November 16, 2010, the resulting Deed of Trust, made out to Monarch, was recorded in the Prince George's County Circuit Court

Land Records. Alston immediately disputed the validity and terms of the loan. In documents dated November 12, 2010—the date she signed the original loan documents—Alston unilaterally executed riders to the Deed of Trust and the Note. The rider to the Deed included the following provision:

> Any offset or claim which Borrower has now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

Wells Fargo Mot. Summ. J. ("Mot.") Ex. 2. The rider to the Note stated that it "supercede[d]" sections 1, 2, and 10 of the original Note and contained a provision allowing Alston to "make all payments under this Note in the form of cash, check, money order, or promissory note." *Id.* Ex. 1 ¶ 2. On December 29, 2015, Alston had a copy of the original Deed of Trust and her unilateral rider recorded in the county land records, annotating the original Deed with the note "re-record to add deed of trust rider." Prince George's County Land Records, Book 32280 at 487.[1] The two documents were recorded that same day.

As part of securing the mortgage, which was insured by the Federal Housing Administration ("FHA"), Alston signed an affidavit indicating that she "will occupy the property as [her] principal residence." Mot. Ex. 19. Two days prior to closing, on November 10, 2010, the seller of the Property executed a Post-Settlement Occupancy and Lease Agreement providing that the seller could reside at the Property for 30 days after closing, and including a handwritten additional provision stating: "No extensions to be accepted after 30 days of closing. Seller must vacate within 30 days of settlement." Alston Resp. Opp'n Mot. Summ. J. ("Opp'n") Ex. 1 at 5. Although this provision required that the seller move out by December 12, 2010, Alston did not

---

[1] The Court takes judicial notice of land records pursuant to Federal Rule of Evidence 201(b)(2).

enforce that agreement or move into the apartment at that time.  In fact, Alston has not lived in that apartment at any point after purchasing it, but continues to use it as a rental property.  At the time that Alston originally closed on the property, she was charging rent in the amount of $1,469.32 per month.

On December 16, 2010, Monarch sold Alston's mortgage to Wells Fargo.  In a letter dated December 17, 2010, Monarch informed Alston that the first payment on her mortgage was due on January 1, 2011; that her loan was being transferred to Wells Fargo; that she should begin remitting payments to Wells Fargo beginning on February 1, 2011; and that any payments due before that date should be remitted to Monarch.  In a letter dated December 27, 2010, Wells Fargo informed Alston that her mortgage had been transferred from Monarch, that the transfer would become effective on February 1, 2011, and that beginning on that date, she should remit her mortgage payments to Wells Fargo.  At some point "well before" January 20, 2011, Monarch shipped the original promissory note underlying the mortgage to Wells Fargo.  Mot. Ex. 5 at 19-20.  Although Alston's mortgage had been sold to Wells Fargo, the promissory note was mistakenly endorsed to Bank of America.  By July 2011, that error was corrected, and the Note was endorsed to Wells Fargo.

## II.    Alston's Mortgage Payments

In December 2010, Alston began to send payments to Monarch for her $811.53 monthly loan payment.  On December 20, 2010, Alston sent a check for $676.94 that included the annotation, "Do not deposit/cash before reading both Rider to Note & Deed of Trust.  Depositing/cashing this check constitute acceptance of the Amendments."  Mot. Ex 4 at 2.  On January 18, 2011, she sent Monarch a check for the remaining balance of $134.59.  That check contained the more expansive annotation, "Depositing, cashing, or retaining this check

constitutes acceptance of the Rider to Note and Deed." *Id.* Over the ensuing seven months, all of the payments Alston submitted to Monarch had some form of the above annotations. Monarch returned those checks to Alston, informing her that they would not accept any such conditional payments. As a result, Alston had a past due balance with Monarch for the January 2011 payment. Although Wells Fargo took over servicing of Alston's mortgage on February 1, 2011, Monarch continued to send Alston billing statements through April 2011 because of her overdue January 2011 balance.

On August 4, 2011, Alston submitted to Monarch Bank a cashier's check for $6,492.24, representing eight monthly payments of $811.53. The check was made payable to "Monarch Mortgage, Deed of Trust Book 32200, pp. 487-504," the land deed entry that included Alston's unilateral rider to the Deed of Trust. Mot. Ex. 14. Alston also annotated the payment coupon with "Deed of Trust Book 32280, pp. 487-504." *Id.* Rather than returning the cashier's check to Alston, Monarch endorsed it and forwarded it to Wells Fargo. Wells Fargo refused to accept the check. From February 2011, when Wells Fargo began servicing the mortgage, to August 2011, Alston sent no payments to Wells Fargo.

### III.    Alston's Correspondence with Wells Fargo

While Alston was sending conditional payments to Monarch, she was disputing Wells Fargo's ownership of her mortgage. On January 20, 2011, Alston sent a letter to Wells Fargo asking to be provided evidence that Monarch had assigned her promissory note to Wells Fargo.[2]

---

[2] The Court relies for this and other information on exhibits submitted as part of Alston's December 2013 Motion for Partial Summary Judgment. There is no dispute over the authenticity or admissibility of those exhibits. The Court thus treats the exhibits to Alston's Motion for Partial Summary Judgment as part of the record in its evaluation of the present Motion. *See* Fed. R. Civ. P. 56(c)(3) (providing that in evaluating a Motion for Summary Judgment, the Court "may consider other materials in the record").

In a letter dated February 3, 2011, Wells Fargo informed Alston that it was the valid servicer of the loan and provided her a copy of the Note and Deed of Trust. Alston also pursued her objections with Monarch. In a February 2011 email exchange with a Monarch representative, she asserted that she had "received nothing verifying Wells Fargo holds the Note" and therefore that she would "continue to make payment to Monarch because I don't recognize Wells Fargo as the owner of my loan." Mot. Ex. 11 at 3. In response to these assertions, Monarch assured Alston that Wells Fargo was the proper owner and servicer of her mortgage.

In a March 3, 2011 letter to Wells Fargo, which Alston characterizes as a "qualified written request" ("QWR") within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq. (2012), Alston questioned the validity of the underlying mortgage itself, asserting that "a bona fide dispute exists between myself and Monarch as to the origination of this alleged 'loan,'" and challenged the Note and Deed that Wells Fargo forwarded with its February 3, 2011 letter, explaining that both were "missing their respective Riders." Alston Mot. Part. Summ. J. ("Alston MPSJ") Ex. 14. In a March 22, 2011 responsive letter, Wells Fargo again informed Alston that it was her loan servicer.

On April 10, 2011, Wells Fargo sent a letter to Alston informing her that because she had failed to make her payments, her mortgage loan was in default. Wells Fargo informed Alston that unless she paid her full past due balance in certified funds by May 25, 2011, her loan would be accelerated. The letter also warned Alston that if her loan were accelerated, Wells Fargo "may take steps to terminate your ownership in the property by a foreclosure proceeding." Mot. Ex. 12 at 4. That same month, Wells Fargo began to report Alston's mortgage account as delinquent to credit reporting agencies. In an April 21, 2011 letter, Alston responded, in relevant part, that she "ha[d] sent checks to Monarch Bank for all payments due" and that she would not

5

remit payments directly to Wells Fargo until Wells Fargo "establishes they are the duly authorized holder of the Note." Mot. Ex. 13 at 1. She again challenged Wells Fargo's claim to her mortgage, arguing that under the Maryland Commercial Law, Wells Fargo was entitled to enforce the Note only if it was endorsed to Wells Fargo or if Wells Fargo was actually "in possession of the Note." *Id.* at 3.

In a letter dated June 9, 2011, Wells Fargo informed Alston that her "loan file ha[d] been referred to our attorneys with instructions to begin foreclosure proceedings" and that the entire balance of her mortgage was "due and payable." *Id.* Ex. 12 at 5. On June 23, 2011, Alston submitted another letter she characterizes as a QWR, which stated that "as soon as Wells Fargo provides me the documentation that shows they are the rightful party to receive payment I will make payment." Alston MPSJ Ex. 16. On July 1, 2011, Wells Fargo's attorneys sent Alston a letter stating that the entire balance of her mortgage loan was due and informing her that a foreclosure sale might be scheduled. On July 5, 2011, in response to Alston's June 23, 2011 letter, Wells Fargo reasserted that it had "a valid loan and lien" on the 7929 Mandan Road apartment. Mot. Ex. 12 at 6. Wells Fargo included with that letter a copy of Alston's promissory note, which, by that time, had been correctly endorsed to Wells Fargo.

On July 18, 2011, Alston sent Wells Fargo another letter contesting Wells Fargo's entitlement to collect on her mortgage loan and also challenging Wells Fargo's reporting to credit reporting agencies of her mortgage account as delinquent. Wells Fargo responded on August 3, 2011 with its same assertion that it was entitled to enforce her mortgage loan. Regarding Alston's concerns about her credit report, Wells Fargo noted that it was "required to report the accurate payment history for [her] mortgage loan," and that, as of the date of the letter,

"her loan stands due for the February 2011 monthly mortgage payment." Alston MPSJ Ex. 8. As a result, Wells Fargo concluded, Alston's loan was in "active foreclosure." *Id.*

Foreclosure proceedings were never formally instituted. Instead, on September 7, 2011, Wells Fargo demanded that Monarch repurchase the loan, asserting that the sale of the loan to Wells Fargo violated various representations, including a representation that the loan did not involve fraud. Wells Fargo explained to Monarch that Alston had refused to submit any unconditional payments on the loan, continued to challenge Wells Fargo's right to service the loan, and had executed a deed and rider that "attempt[ed] to change the loan terms." Mot. Ex. 15 at 3. Monarch conceded that it was "becoming increasing[ly] clear that the borrower may have obtained the loan with the intention of not repaying it" and agreed to the repurchase. *Id.* The loan was officially transferred back to Monarch on October 28, 2011, along with Alston's August 2011 cashier's check.

Meanwhile, Alston continued. On September 11, 2011, she submitted another letter challenging Wells Fargo's right to enforce the loan, asserting that she was tendering her mortgage payments to Monarch, and instructing Wells Fargo to "cease reporting negative information to the credit reporting agencies." Alston MPSJ Ex. 18. On September 27, 2011, Wells Fargo replied with a letter nearly identical to its August 3, 2011 response. On October 10, 2011, Alston submitted yet another letter to Wells Fargo, which she now describes as a QWR, once again challenging Wells Fargo's entitlement to enforce her mortgage loan. This time, she also included a copy of the August 2011 cashier's check to Monarch and complained that Wells Fargo's reporting made it appear that she was "making no payments whatsoever" when, "in actuality I am making payments to the party ... that I believe is legally entitled to collect on the note." Alston MPSJ Ex. 19. On October 28, 2011, Wells Fargo sent Alston a letter informing

her that her loan was being transferred back to Monarch and that Monarch would begin accepting payments on November 15, 2011.

During this period, Wells Fargo reported Alston's mortgage as delinquent. Specifically, Wells Fargo reported that each monthly payment from April 2011 to October 2011 was past due, with the exception of the August 2011 payment. In August 2011, after Alston's cashier's check had been forwarded to Wells Fargo from Monarch, Wells Fargo reported the account as current, leading to credit reports noting that monthly payment as "OK." In November 2011, Wells Fargo reported the account as closed. Alston filed several disputes with credit reporting agencies related to this reporting, but Wells Fargo continued to report the mortgage as past due for each month from April to October 2011, with the exception of August.

## IV.    Procedural History

On April 1, 2013, Alston filed suit against Wells Fargo in the Circuit Court for Prince George's County, Maryland asserting four causes of action: (1) violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code, Com. L. §13-301 *et seq.* (2013) and the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code, Com. L. §14-201 *et seq.* (2013); (2) violation of RESPA, 12 U.S.C. § 2601 *et seq.* (2012); (3) violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.* (2012); and (4) defamation, based on the allegedly inaccurate credit reporting. Wells Fargo was served with that Complaint on September 24, 2013 and removed the case to this Court on October 23, 2013. On November 19, 2013, Alston filed an Amended Complaint that added factual allegations but did not allege any new causes of action. Wells Fargo answered that Amended Complaint on December 3, 2013. Prior to the commencement of discovery, Alston filed a Motion for Partial Summary Judgment in which she asserted that she was entitled to summary judgment on her MCPA, MCDCA, RESPA,

8

and FCRA claims. Wells Fargo opposed the motion in part on the grounds that it had not yet had a reasonable opportunity for discovery. On January 30, 2014, the Court (Motz, J.) denied Alston's Motion for Partial Summary Judgment after determining that discovery was necessary.

On January 6, 2014, the Court issued a Scheduling Order setting a discovery deadline of March 6, 2014. Over the ensuing year, the discovery deadline was repeatedly extended such that discovery did not close until May 8, 2015, over a year after the initial deadline. Based on the revised schedule, the deadline for the filing of dispositive motions was extended to June 5, 2015. Meanwhile, on March 24, 2015, the parties postponed a scheduled settlement conference in anticipation and until resolution of dispositive pretrial motions. On April 28, 2015, Wells Fargo filed a Motion for Leave to File an Amended Answer. On April 29, 2015, in advance of the discovery and dispositive motions deadlines, and only nine days before the close of discovery, Wells Fargo filed its Motion for Summary Judgment. Alston opposed that Motion on May 16, 2015, asserting that the Motion should be denied because she had not yet had an adequate opportunity to complete discovery. That Motion became ripe for disposition on June 4, 2015 with the filing of Wells Fargo's Reply Memorandum.

On June 1, 2015, Alston filed a Motion to Compel with the Court in which she asserted that Wells Fargo's timely responses to her interrogatories propounded on February 3, 2014 and March 10, 2014 were inadequate. On November 24, 2015, Alston filed a second Motion to Compel with the Court in which she asserted that Wells Fargo had failed to provide her with adequate responses to interrogatories that she propounded on April 7, 2015. On December 16, 2015, United States Magistrate Judge William Connelly denied both Motions. On December 25, 2015, Alston filed a Motion for Reconsideration of the denial of the Motions to Compel.

## DISCUSSION

### I.    Alston's Motion for Reconsideration

Alston seeks reconsideration of Magistrate Judge Connelly's denial of the Motions to Compel.    In those Motions, Alston sought responses, or more detailed responses, to interrogatories and document requests seeking information that collectively fit within the following categories:    Monarch's transfer of Alston's loan to Wells Fargo; Wells Fargo's investigations into Alston's complaints about the information provided by Wells Fargo to credit reporting agencies; Wells Fargo's investigative and compliance procedures; lawsuits brought by other Wells Fargo customers relating to allegedly inaccurate credit information; and communications between Wells Fargo, its law firm, and its credit reporting agencies.   Alston also sought additional information relating to the theory that Wells Fargo was the holder of the Note between February and July 2011, and on how Wells Fargo handled the August 2011 cashier's check payment.   In denying the Motions, the Magistrate Judge concluded that the information sought either had already been produced, was not relevant, was not reasonably calculated to lead to discovery of admissible evidence, or was privileged.   In making these determinations, the Magistrate Judge considered, among other information, a Memorandum Opinion issued by this Court in a related case, *Alston v. Transunion, et al.*, Civil Action No. 14-1180 ("the Transunion Opinion").

Alston seeks reconsideration based on a series of overlapping alleged errors which can be grouped into two categories: (1) that the Magistrate Judge incorrectly relied on and applied the Transunion Opinion; and (2) that the Magistrate Judge erroneously determined that Alston's discovery requests were unlikely to lead to any relevant information or the discovery of admissible evidence. Federal Rule of Civil Procedure 72(a) allows a district judge to modify or

10

set aside the order of a magistrate judge pertaining to any non-dispositive matter only if the magistrate judge's order is "clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). A finding of fact is clearly erroneous if the reviewing court is left "with the definite and firm conviction that a mistake has been committed." *Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir. 1985) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948)). This deferential standard is not met here.

Turning to Alston's first proffered basis for reconsideration, Alston asserts that in the Transunion Opinion denying her Motion for Partial Summary Judgment, this Court, viewing the evidence in the light most favorable to the defendants, did not find that Alston's claims failed as a matter of law. Alston thus argues that the Magistrate Judge erred by relying on that ruling in concluding, in the context of the discovery motions in this case, that Alston's claims fail as a matter of law. Alston misreads the Magistrate Judge's decision. Rather than concluding that the Transunion Opinion made a legal determination on the validity of Alston's claims and granting it preclusive effect in this case, the Magistrate Judge considered the full range of information presented—including the parties' briefs, the related facts and legal analysis in the Transunion Opinion, and a series of undisputed facts revealed in discovery to date—and reached his own determination relating to *this* case that Alston's claims are untenable. In particular, the Magistrate Judge relied on the deposition testimony of a Monarch Bank representative, and correspondence already produced in discovery relating to the transfer of the Note to Wells Fargo, in reaching this determination. *See* Order Denying First Mot. Compel at 4-7.

To the extent that Alston claims that the Transunion Opinion precludes the Magistrate Judge's finding, that argument also fails because that Opinion resolved only the question whether Alston *succeeded* on her claims as a matter of law. This Court in *Alston v. Transunion, et al.*

was not presented with—and therefore did not decide—whether her claims *failed* as a matter of law.   Thus, the Magistrate Judge's determination that Alston's requested discovery was irrelevant because her claims likely failed as a matter of law was not inconsistent with the Transunion Opinion.   Alston's contention that this Court should reconsider the Magistrate Judge's Orders because those Orders misinterpret and misapply this Court's determinations in *Alston v. Transunion, et al.* is therefore rejected.

Alston also argues that the Magistrate Judge's rulings are erroneous because they conflict with the Court's determination in *Alston v. Transunion, et al.* that Alston would be permitted to pursue further discovery and seek reconsideration of the Transunion Opinion as part of post-discovery dispositive motion practice. This claim also fails. The *Transunion* case is a separate matter, with different defendants, such that none of the decisions there are binding in the present case. Moreover, discovery in the two cases proceeded at different rates, and the discovery needs in *Transunion* are not identical because the defendants there are credit reporting agencies, not the former mortgage servicer. There is nothing about the rulings in *Transunion* that preclude the Magistrate Judge's rulings on the discovery motions in this case.

As to Alston's second basis for reconsideration, Alston disagrees with the Magistrate Judge's findings that Alston's requests would not be likely to lead to relevant evidence because Alston's claims necessarily fail. Alston takes issue with the Magistrate Judge's firm conclusions that (1) based on the records and testimony from Monarch, Wells Fargo was the legitimate servicer of Alston's loan; and (2) based on the uncontroverted evidence that all of Alston's payments were conditioned on acceptance of riders that would have undone the mortgage, Alston made no valid payments to Wells Fargo during the time that it held her loan. Those findings support his subsequent conclusion that the additional requested discovery would be futile. As

discussed below in relation to the Motion for Summary Judgment, the record evidence available at the time of the Magistrate Judge's rulings firmly establishes that those findings were correct and that the FCRA, MCPA, MDCPA, and RESPA claims fail as a matter of law.

Finally, the Magistrate Judge concluded that on the remaining discovery disputes, the responses Alston had received from Wells Fargo were adequate. This Court has no reason to second-guess those determinations. The Court certainly has no reason to conclude that Alston has, as she repeatedly asserts, been denied her "opportunity to develop support for [her] claims through discovery." Mot. Recons. *passim.* Alston had 16 months of discovery, and during that period she propounded three sets of interrogatories, requested and received multiple documents, and took multiple depositions. While she may not have received from Wells Fargo all the materials she sought, it appears that discovery in this case has been more than sufficient.[3]

## II.     Wells Fargo's Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

---

[3]   Alston also asserts that the Magistrate Judge's Orders ignored Judge Motz's January 30, 2014 determination, in relation to Alston's Motion for Partial Summary Judgment filed prior to discovery in this case, that Alston's claims could not be resolved without discovery. This argument merits little comment. There has now been discovery in this case, and both parties had ample time—16 months—in which to conduct it.

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

### A.      Request for Discovery

Wells Fargo seeks summary judgment on all of Alston's claims. Alston opposes that motion, asserting that she has not yet had an adequate opportunity for discovery.[4] She claims, through an affidavit from her attorney pursuant to Federal Rule of Civil Procedure 56(d), that prior to a ruling on summary judgment, she needs additional discovery on four issues: (1) whether Wells Fargo was the holder of the Note; (2) whether Wells Fargo reported inaccurate information about her payment history; (3) whether Wells Fargo could foreclose on the property; and (4) whether Wells Fargo complied with RESPA.

Alston's assertion that summary judgment is premature is difficult to credit. When Alston filed a Motion for Partial Summary Judgment in December 2013, before discovery had

---

[4]      Alston also asserts that Wells Fargo's Motion for Summary Judgment should be denied because Wells Fargo failed to comply with Local Rule 105.2(c), which requires that "[i]n a two-party case, if both parties intend to file summary judgment motions, counsel are to agree among themselves which party is to file the initial motion." Wells Fargo filed its Motion for Summary Judgment about one month in advance of the dispositive motion deadline, and it appears it did so without first consulting with Alston about a briefing schedule. Alston was on notice, however, of Wells Fargo's intent to file a Motion for Summary Judgment, as the parties postponed a mediation session with a Magistrate Judge "until after resolution of dispositive pretrial motions." Order, ECF No. 43. Regardless, Alston filed her Motion for Partial Summary Judgment in violation of Local Rule 105.2(c), as Wells Fargo pointed out at the time, and the Court (Motz, J.) did not dismiss it on that basis. The Court thus extends Wells Fargo the reciprocal courtesy.

even commenced, she vigorously asserted that the factual record was sufficient for the Court to grant summary judgment in her favor on all of her claims with the exception of defamation, a claim that, as discussed below, ultimately rises and falls with her FCRA claim. Alston has thus represented to this Court that the factual record for this case was sufficient for summary judgment over two years ago.

Moreover, unlike a typical claim that a motion for summary judgment should be denied because discovery is necessary, Fed. R. Civ. P. 56(d), this is not a case in which no discovery has occurred. *See Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 421 (D. Md. 2006) (stating that summary judgment is generally only appropriate after adequate discovery). At the time the Motion was filed, only nine days before the discovery deadline, Alston had had almost 16 months to conduct discovery. Because none of Wells Fargo's arguments are novel or unanticipated, she had ample opportunity to obtain relevant evidence on those issues in those 16 months. Where Alston has not explained why the discovery already received is insufficient for her to respond to Wells Fargo's Motion for Summary Judgment, the Court may consider the summary judgment motion. *See Amirmokri*, 437 F. Supp. 2d at 421 (finding that despite the plaintiff's filing of a Rule 56 affidavit, summary judgment was not premature because, in part, the plaintiff "has presented no reason as to why the discovery [previously] provided ... is insufficient" to enable him to respond to the defendant's motion).

Finally, the requested discovery is not necessary because, as discussed below, it would not "materially affect the outcome of this case." *Amirmokri*, 437 F. Supp. 2d at 421. "[A] court may deny a Rule 56(d) motion when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014). Whether Wells Fargo was the holder of the Note does

15

not affect the outcome of this case because Wells Fargo was entitled, as a nonholder in possession of the Note, to foreclose on the loan. *See infra* part II.B.  Whether Wells Fargo reported inaccurate information is no longer at issue because it is undisputed that Alston submitted all of her payments with conditions, and such conditions render the payments invalid as a matter of law. *See infra* part II.B. And whether Wells Fargo complied with RESPA is not at issue because the requests at issue do not qualify as QWRs under RESPA as a matter of law. *See infra* part II.E.

Alston's request for additional discovery is therefore denied, and the Court proceeds to Wells Fargo's Motion.

### B.    FCRA

The FCRA creates a duty for furnishers of credit information to provide accurate information to credit reporting agencies, to correct inaccuracies, and to investigate disputed information upon notice from a credit reporting agency.  15 U.S.C. § 1681s-2(b).  Alston asserts that Wells Fargo breached this duty by failing to provide accurate information about her mortgage account to the credit reporting agencies, to investigate adequately Alston's disputes of that information, and to alter that information when the credit reporting agencies asked Wells Fargo to confirm the reported information.  Alston bases her claim on two premises:  first, that "Wells Fargo was not entitled to receive payment" because it "did not qualify as a holder of the Note," and second, that she "had made timely payments on her mortgage to Monarch Bank." Am. Compl. ¶¶ 101, 103. Both premises are false.

In asserting that Wells Fargo was not entitled to enforce the Note underlying her mortgage loan, Alston cites the fact that the Note had been mistakenly endorsed to Bank of America.  However, endorsement is not the only means by which a person or organization can

become entitled to enforce a promissory note. Under the Maryland Commercial Law, which governs promissory notes secured by deeds of trust, a promissory note can either be transferred or negotiated. *See Anderson v. Burson*, 35 A.3d 452, 460-61 (Md. 2011). A note is "negotiated" when the holder endorses it to someone else, and gives possession of the note to that person, making that person the holder of the instrument. *Id.* at 461. A note is "transferred" when the original holder of the note "intend[s] to vest in the transferee the right to enforce the instrument" and "deliver[s] the instrument so the transferee receives actual or constructive possession." *Id.* A transferee thus becomes a "nonholder in possession of the instrument who has the rights of the holder," meaning that it rightfully possesses the note and the right to enforce it, even though the note itself has not been endorsed to that nonholder. *Id.* Under Maryland law, a "nonholder in possession of the instrument who has the rights of the holder" may enforce that instrument. Md. Code, Com. L. § 3-301. That was Wells Fargo's situation here.

The uncontradicted evidence establishes that Wells Fargo purchased Alston's mortgage from Monarch Bank on December 16, 2010, such that Monarch intended to vest its right as original holder of Alston's promissory note in Wells Fargo. Monarch Bank accordingly transferred possession of the promissory note underlying that mortgage to Wells Fargo "well before" January 20, 2011. Mot. Ex. 5 at 19. Because Monarch did not successfully endorse the Note over to Wells Fargo, at that point Wells Fargo was not the "holder" of the Note. But by January 20, 2011 at the latest, Wells Fargo was a nonholder in possession of Alston's promissory note who had the rights of the holder. *See Anderson*, 35 A.3d at 461. Under Maryland Commercial Law § 3-301, Wells Fargo was thus entitled to demand from Alston her February 1, 2011 mortgage payment as well as all of the subsequent payments.

Alston essentially knew these facts.  In December 2010, she was informed by both Monarch and Wells Fargo, in writing, that it had sold her mortgage to Wells Fargo, so she knew that Monarch intended to vest Wells Fargo with its rights to her promissory note.  When, in January 2011, Alston informed Wells Fargo that she was unsatisfied with this information, Wells Fargo sent Alston a copy of the Note and Deed of Trust to establish the legitimacy of its claim to be able to enforce the loan.  Subsequent communications with both Monarch and Wells Fargo confirmed, again and again, the same information:  Monarch had sold Alston's loan, and provided possession of the Note, to Wells Fargo.  Then on July 5, 2011, Wells Fargo provided Alston with another copy of the Note, this one with the corrected endorsement, which made Wells Fargo the holder of the Note.  To be sure, the erroneous endorsement to Bank of America may have warranted an inquiry, but Alston has never alleged, nor is there any evidence indicating, that Bank of America or any mortgage servicer other than Monarch or Wells Fargo attempted to collect on Alston's mortgage loan.

As to Alston's second premise, the evidence also shows that Alston never made valid payments on the loan.  Had Alston done what she asserts she did—paid Monarch until the issue of who could service her loan was resolved to her satisfaction—she may have had a legitimate claim that she was making valid payments on the loan, though to the wrong servicer.  But the evidence conclusively establishes that while engaged in her dispute with Wells Fargo over its right to enforce the Note, Alston was engaging in a parallel scheme against Monarch to undo her mortgage loan entirely.  On the day she closed on her mortgage, Alston executed unilateral riders to the Note and the Deed of Trust that radically changed the terms of the loan in her favor, allowing her to make payments in "promissory notes," Mot. Ex. 1 ¶ 2, and providing that "[a]ny offset or claim which Borrower has now or in the future against Lender shall relieve Borrower

18

from making payments due under the Note." *Id.* Ex. 2. In short, Alston's riders would not just change the terms of her loan, they would dismantle it entirely. Alston does not appear to have provided a copy of these riders to Monarch or Wells Fargo, but she recorded the rider to the Deed of Trust in the county land records.

After essentially setting a trap by unilaterally executing the riders, Alston then made all of her payments to Monarch conditioned on Monarch's acceptance of her secret, unilateral terms. On each check she submitted, she wrote in language identical or substantially similar to the following: "Do not deposit/cash before reading both Rider to Note & Deed of Trust. Depositing/cashing this check constitute acceptance of the Amendments." Mot. Ex. 4 at 2. It is these conditional payments that Alston cites to prove that, throughout the period when Wells Fargo was her loan servicer, she dutifully paid her mortgage, albeit to Monarch. But "a tender that contains a condition which would prejudice the creditor's rights is invalid." *Cochran v. Griffith Energy Service, Inc.*, 993 A.2d 153, 167 (Md. Ct. Spec. App. 2010). *See also Heighe v. Sale of Real Estate*, 164 A. 671, 674 (Md. 1933) (holding that a mortgage holder was not required to accept mortgage payments unless the "tender" was "unconditional"). Here, Alston's tendered payments would not merely have prejudiced the rights of Monarch or Wells Fargo, they would have essentially extinguished them. These "payments" were therefore not valid as a matter of law.

Because none of the payments that Alston made was legally valid, Wells Fargo's reporting of that account as delinquent from April 2011 to October 2011, with the exception of August 2011, was completely accurate. Although Wells Fargo, when faced with the August cashier's check, initially reported Alston to be current for that month, that designation does not support an FCRA claim. The August 2011 cashier's check, providing a lump sum payment of

19

$6,492.24, was made payable to "Monarch Mortgage, Deed of Trust Book 32200, pp. 487-504," the land deed entry that included Alston's unilateral rider to the Deed of Trust, rendering that payment as confusing and invalid as her prior checks. A credit report can be deemed "inaccurate" under the FCRA only if it is "patently incorrect" or when it is "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001) (internal quotation marks, punctuation, and citation omitted).

Here, Wells Fargo was faced with the legal question whether Alston's cashier's check containing Alston's confusing and misleading annotations was a legally valid payment, and it gave Alston the benefit of the doubt on that question. This provisional determination cannot be deemed patently incorrect because it is not a factual question, but a legal one. *See Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) (emphasizing that an FCRA claim requires a "showing [of] *factual* inaccuracy, rather than the existence of disputed legal questions" because furnishers of credit information are "neither qualified nor obligated" to resolve legal questions) (emphasis in original) (internal quotation marks and citation omitted)). The reporting of Alston as current or "OK" in August 2011 was also not misleading so as to have an adverse effect on Alston. Rather, that reporting inured to Alston's benefit.

Because the information that Wells Fargo provided to credit reporting agencies was not "inaccurate," Alston's contention that Wells Fargo violated § 1681s-2(b) of the FCRA by not adequately investigating her disputes, not adequately reviewing information provided to it by the credit reporting agencies, and refusing to change its reporting based on her disputes fails as a matter of law. *Chiang*, 595 F.3d at 37 (applying the Fourth Circuit's definition of "inaccuracy" in *Dalton* to claims under 15 U.S.C. § 1681s-2(b)). As the court held in *Chiang*, the FCRA is

20

designed to prevent the "compilation and dissemination of *inaccurate* credit information," so a plaintiff cannot prevail on a claim against a credit furnisher under 15 U.S.C. § 1681s-2(b) without "a showing of actual inaccuracy." *Id.* at 38 (emphasis in original). The undisputed record evidence demonstrates that Alston cannot make this showing. Wells Fargo is thus entitled to summary judgment on Alston's FCRA claim.

### C.   MCPA and MCDCA

Together, the MCPA and MCDCA prohibit the use of certain unfair or deceptive trade practices and set out standards for appropriate conduct in the practice of debt collection. The MCPA makes it unlawful to "engage in any unfair or deceptive trade practice" in "[t]he collection of consumer debts." Md. Code, Com. L. § 13-303(5). An "unfair or deceptive trade practice" includes making a "[f]alse, falsely disparaging, or misleading oral or written statement ... which has the capacity, tendency, or effect of deceiving or misleading consumers" as well as violating certain provisions of the MCDCA. Md. Code, Com. L. §§ 13-301(1), (14)(iii). The MCDCA provides that a debt collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist" or "disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false." Md. Code, Com. L. §§ 14-202(8), (3).

Alston's MCPA and MCDCA claims are premised on the assertion that Wells Fargo was not entitled to enforce the Note underlying her mortgage loan. Alston thus reasons that in its June, July, and August 2011 communications with her about her delinquent mortgage loan, and in the communications sent to Alston by Wells Fargo's attorneys, Wells Fargo violated the MCPA and MCDCA because those communications falsely asserted that Wells Fargo was entitled to receive payments on her mortgage loan and to foreclose on the property if it did not

receive those payments. She asserts that Wells Fargo also violated these two statutes by then reporting her as delinquent on her mortgage account to credit reporting agencies. These claims lack merit.

As a threshold matter, Alston's MCPA and MCDCA claims as to Wells Fargo's reporting of her delinquent account to credit reporting agencies is preempted by the FCRA. The FCRA is "a comprehensive statutory scheme designed to regulate the consumer reporting industry." *Ross v. F.D.I.C.,* 625 F.3d 808, 812 (4th Cir. 2010). In keeping with that broad regulatory purpose, in 1996, Congress amended the FCRA to add a preemption provision to avoid the need to navigate conflicting credit reporting laws across various states. *Id.* at 813. That provision mandates that "[n]o requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under ... section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies[.]" 15 U.S.C. § 1681t(b)(1)(F). Thus, to the extent that Alston's MCPA and MCDCA claims are based on allegedly false information that Wells Fargo provided to credit reporting agencies, those claims can be brought only through the FCRA. *See Ross,* 625 F.3d at 812-13 (holding that claims relating to credit reporting brought under the North Carolina Unfair Deceptive Trade Practices Act and the North Carolina Debt Collection Act are preempted by the FCRA). Wells Fargo is therefore entitled to summary judgment on that aspect of Alston's MCPA and MCDCA claims.

Wells Fargo is also entitled to summary judgment on the remainder of Alston's MCPA and MCDCA claims because her mortgage is not covered by either of those statutes. The MCPA provisions she alleges to have been violated apply only to "consumer debts," which are in turn defined as debts "which are primarily for personal, household, family, or agricultural purposes." Md. Code, Com. L. § 13-101(d)(1). "[F]or all practical purposes," "personal, household, family,

or agricultural purposes" are the same as "personal, family, or household purposes." *Boatel Indus. v. Hester*, 550 A.2d 389, 399 (Md. Ct. Spec. App. 1988). The MCDCA has similar language, defining a debt "collector" as an individual attempting "to collect an alleged debt arising out of a consumer transaction," and defining a "consumer transaction" as a transaction undertaken for "personal, family, or household purposes." Md. Code, Com. L. § 14-201(b), (c). Alston, by her own admission, has not lived a single day at the 7929 Mandan Road property, but instead has rented it out. Alston's mortgage loan was not for personal, family, or household purposes, but was instead used in service of the business purpose of acquiring and operating a rental property. It is therefore outside the ambit of the MCPA and MCDCA.

Alston, however, insists that she intended to live in the apartment at the time she purchased it, and that her intention should control how the purpose of her loan is classified. She asserts that she decided not to move in only because of the ensuing problems with Monarch and Wells Fargo. Alston's assertions are belied by the record. The Post-Settlement Occupancy and Lease Agreement required that the seller of 7929 Mandan Road, Apartment 301, move out by December 12, 2010 and emphasized that no extensions of that deadline would be allowed. The documents that Alston herself submitted to the Court thus establish that Alston was to be able to move into the Property by December 13, 2010, several days before Monarch sold her mortgage to Wells Fargo on December 16, 2010. All of Alston's disputes with Monarch and Wells Fargo thus began *after* the Property was hers to occupy, yet she allowed the seller to remain there after the deadline. Furthermore, as discussed above, Alston's disputes with Monarch and Wells Fargo were wholly of her own making, particularly her scheme to make conditional payments in order to get Monarch to accept the terms of her riders. *See supra* part II.B. The record therefore does not support Alston's assertion that she intended to live in the 7929 Mandan Road apartment and

23

never moved in only because of her uncertainties about her mortgage caused by Monarch and Wells Fargo. Alston's efforts to invoke the protections of the MCPA and MCDCA are thus disingenuous at best, particularly in light of the fact that she used an FHA mortgage—with its favorable terms designed to enable first-time homebuyers to purchase owner-occupied properties—to acquire what has been a rental property ever since she purchased it.

Even if the MCPA and MCDCA applied to Alston's mortgage, Wells Fargo would still be entitled to summary judgment. As explained in the discussion of Wells Fargo's liability under the FCRA, Wells Fargo was entitled to enforce Alston's mortgage loan from February 2011 until October 28, 2011, when it was transferred back to Monarch. *See supra* part II.B. Thus, the communications about which Alston complains, all of which occurred during that time period, cannot be the basis for an MCPA or MCDCA claim because Wells Fargo and its attorneys did not falsely claim that they were entitled to enforce Alston's mortgage loan.

For all of these reasons, the Court grants summary judgment to Wells Fargo on the MCPA and MCDCA claims.

### D.    Defamation

Alston asserts that Wells Fargo "intentionally and maliciously" reported her mortgage loan as delinquent to credit reporting agencies, thereby defaming her. Am. Compl. ¶ 114. Although it would seem, based on 15 U.S.C. § 1681t(b)(1)(F), that Alston's defamation claim would be preempted by the FCRA, that preemption provision appears to conflict with a separate provision in the FCRA that bars a defamation action "with respect to the reporting of information against any person who furnishes information to a consumer reporting agency . . . *except* as to false information furnished with malice or willful intent to injure." 15 U.S.C. § 1681h(3) (emphasis added). In light of this tension, 15 U.S.C. § 1681t(b)(1)(F) has been interpreted within

this District to apply only to state statutory schemes, not to state common law causes of action. *See, e.g., White v. Green Tree Servicing, LLC,* \_\_\_\_ F. Supp. 3d \_\_\_\_, 2015 WL 4647944 at \*3-\*5 (D. Md. 2015).  15 U.S.C. § 1681h(3), in turn, does not preempt the defamation claim because that provision applies only where the information was disclosed pursuant to section 1681g, 1681h, or 1681m of this title[.]"  15 U.S.C. § 1681h(e).  Here, Wells Fargo disclosed credit information pursuant to § 1681s.

Although Alston's defamation claim is not preempted, it also does not succeed.  "To recover for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm."  *Rosenberg v. Helinski*, 616 A.2d 866, 871 (Md. 1992).  Because establishing defamation requires proof of a false statement, the analysis of Alston's defamation claim folds in to the analysis of her FCRA claim.  As discussed above, Wells Fargo's reporting of Alston's mortgage account was not inaccurate because Alston never made a valid, unconditional payment to Monarch or Wells Fargo.  *See supra* part II.B.  Alston therefore cannot establish, as she alleges, that in making statements to the credit reporting agencies Wells Fargo was disseminating false statements about her.  Wells Fargo is entitled to summary judgment on Alston's defamation claim.

### E.    RESPA

RESPA requires a mortgage loan servicer to address and respond in writing within 30 days to a "qualified written request" ("QWR") for "information relating to the servicing of [a] loan," 12 U.S.C. § 2605(e)(1)(A), defined as a written request to a mortgage servicer that "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information

sought by the borrower." 12 U.S.C. § 2605(e)(1)(B)(ii). RESPA also requires that when a borrower submits a QWR, the mortgage servicer must wait 60 days before reporting any disputed information to a credit reporting agency. 12 U.S.C. § 2605(e)(3).

Alston asserts that her various letters to Wells Fargo contesting its claim to own her mortgage are QWRs within the meaning of RESPA and that Wells Fargo mishandled them in two ways. First, she asserts that Wells Fargo violated RESPA's requirement that in responding to a QWR, a mortgage servicer provide the borrower with written clarification including "information requested by the borrower or an explanation of why the information request is unavailable." 12 U.S.C. § 2605(e)(2)(C)(i). Alston does not expressly state how Wells Fargo allegedly violated this provision of RESPA, but this claim is presumably based on Wells Fargo's failure to provide her with documents proving to her satisfaction that it was the valid servicer of her mortgage loan. Second, she asserts that Wells Fargo violated RESPA by improperly reporting derogatory information to the credit bureaus during the 60-day stay required under 12 U.S.C. § 2605(e)(3). Both of Alston's claims fail as a matter of law.

As a threshold matter, Alston's mortgage is not covered by RESPA. RESPA does not apply to "credit transactions involving extensions of credit … primarily for business, commercial, or agricultural purposes." 12 U.S.C. § 2606(a). Credit used for, in relevant part, the purchase of non-owner-occupied rental properties "is deemed to be for business purposes." *Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 417 (9th Cir. 2011) (citing 12 C.F.R. Pt. 226, Supp. I, Cmt. 3(a)(4) (West 2011); *see Taggart v. Wells Fargo Home Mortg. Inc.*, 563 F. App'x 889, 892 (3rd Cir. 2014) (unpublished) (determining that RESPA did not apply to plaintiff's claims because "the financed property at issue … was a rental property at the relevant time" of the alleged RESPA violations); *Henok v. Chase Home Finance*, LLC, 950 F. Supp. 2d

26

96, 98 (D.D.C. 2013) ("RESPA does not apply to loans for non-owner-occupied rental properties."). As explained above in the context of the MCPA and the MCDCA, the 7929 Mandan Road property falls into this category. *See supra* part II.C. Alston, by her own admission, has not lived a single day at the Property, but instead has rented it out. The Property is thus plainly a non-owner-occupied rental property.

Even if RESPA were to apply to Alston's mortgage, her claims would still fail. Under RESPA, a servicer's obligations apply only upon receipt of a QWR seeking "information relating to the servicing of such loan," 12 U.S.C. § 2605(e)(1)(A), indicating that a QWR is a means for a borrower to dispute alleged inaccuracies in how a mortgage servicer is billing or crediting payments or to obtain other information about the servicing of the loan. In this context, "servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan ... and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3). Here, Alston's communications with Wells Fargo uniformly asked Wells Fargo to provide proof that it held the promissory note to her mortgage loan. Such information goes beyond the receiving and posting of payments, which is the limited scope given to "servicing" in the statute.

Several courts, including within this Circuit, have determined that a written communication with a mortgage servicer that disputes the validity of the loan or the servicer's entitlement to collect on the loan does not qualify as a QWR. *See, e.g., Ward v. Security Atlantic Mortg. Elec. Registration Sys. Inc.*, 858 F. Supp. 2d 561, 574-75 (E.D.N.C. 2012) (holding that a request by a borrower to his mortgage servicer seeking "copies of loan documents, assignments of the deed of trust and promissory note and copies of property inspection reports and appraisals

27

and a loan transactional history" was not a QWR within the meaning of RESPA because it was a "communication challenging the validity of the loan and not a communication relating to the servicing of the loan"); *Minson v. CitiMortgage, Inc.*, No. DKC-12-2233, 2013 WL 2383658 at *1, *5 (D. Md. May 29, 2013) (holding that a request by a borrower to her mortgage servicer seeking loan documents, verification of the identity of the note holder, and proof of the servicer's authority to service the loan was not a QWR within the meaning of RESPA) (internal brackets omitted). Here, Alston's correspondence that she claims to be QWRs consistently contained language such as:

> The Note has been endorsed to [Wells Fargo] so it is imperative that you provide me with a written assignment and identify the person in custody of the Note . . . Since no assignment has been recorded publicly then you need to send a certified copy of the assignment to me for my records, and for me to ascertain that [Wells Fargo] is legally authorized to enforce the Note.

Alston MPSJ Ex. 14. Because Alston's communications with Wells Fargo universally and repeatedly sought information about the validity of her mortgage, they were not QWRs within the meaning of RESPA and cannot form the basis for a cause of action under § 2605. Wells Fargo is thus entitled to summary judgment on Alston's RESPA claim.

**III.    Wells Fargo's Motion to Amend Answer**

Because the Court grants summary judgment to Wells Fargo on all of Alston's claims, Wells Fargo's Motion to Amend its Answer is dismissed as moot.

## CONCLUSION

For the foregoing reasons, Alston's Motion for Reconsideration is DENIED, Wells Fargo's Motion for Summary Judgment is GRANTED, and Wells Fargo's Motion to Amend Answer is DISMISSED AS MOOT.  A separate order shall issue.


Date:  February 26, 2016

THEODORE D. CHUANG
United States District Judge